IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. CR-10-385-D |
| | ) | |
| ADOLFO CORRAL, | ) | |
| | ) | |
| Defendant. | ) | |

**O R D E R**

This matter comes before the Court upon Defendant Adolfo Corral's Motion to Suppress Evidence [Doc. No. 71], which the government has timely opposed. On January 27, 2011, the Court held an evidentiary hearing at which Defendant Adolfo Corral appeared personally and through his appointed counsel, David P. Henry. The government appeared through Assistant United States Attorneys André B. Caldwell and David Peterman. The Court heard the testimony of two police officers employed by the Oklahoma City Police Department, Inspector Ronald Bradford and Inspector John Carroll. The Court also heard Defendant's testimony and received Defendant's Exhibit No. 1, which is a copy of a written report prepared by Inspector Carroll. The parties presented oral arguments and adopted their written briefs. Upon consideration of the evidence, the case record, and the parties' arguments, the Court finds and rules as follows on Defendant's Motion.

**Findings of Fact**

Defendant moves to suppress evidence seized from a search of his shoes on November 30, 2010, while he was a passenger on a Greyhound bus traveling from Phoenix, Arizona, to New York City. The only issue presented by Defendant's Motion is whether he voluntarily consented to a

search of his shoes or whether he involuntarily complied with an officer's instructions to remove his shoes.

The evidence presented at the hearing establishes that at about 5:30 p.m. on November 30, 2010, three officers boarded the eastbound bus with the driver's permission at the Oklahoma City bus station, while the bus was fully loaded and preparing to depart. A fourth officer watched through the front window of the bus and was ready to assist as needed; a total of six or seven officers were present at the station. Inspector Bradford and Inspector Carroll proceeded to the rear of the bus and engaged in a routine interdiction activity of "walking the bus" – a process that typically takes 10-15 minutes and involves making contact with every passenger and asking each one a series of questions. The third officer, an agent of the Department of Homeland Security, observed the process from the front of the bus near the driver's seat. The officers identified themselves as police officers when they entered the bus. Passengers were not instructed to remain on the bus, but were not advised they could leave.

Inspector Bradford and Inspector Carroll have training and experience in drug interdiction. Consistent with that training, they were dressed in plain or street clothes, and kept their weapons and handcuffs concealed, but each displayed his badge. Inspector Carroll appeared at the hearing dressed in clothes similar to what he typically wears – a pair of jeans, a t-shirt, and a denim jacket. The officers proceeded to the rear of the bus and moved forward a row at a time. Inspector Bradford worked the driver's side of the bus, going seat to seat; Inspector Carroll did the same on the opposite side. The two officers stood in staggered positions on separate rows approximately three or four feet apart, but moved in tandem so they could overhear each other's conversations with passengers. They spoke in a conversational tone of voice, and asked nonthreatening questions, such as "May I

see your ticket?", "Do you have a bag?", and "May I search your bag?". During this process, passengers were free to move about the bus or to leave the bus if they chose.

After talking to approximately eight passengers, Inspector Bradford made contact with Defendant, who was seated toward the rear of the bus in a window seat. Inspector Bradford asked to see Defendant's ticket and where he was coming from. Inspector Bradford noticed the trip originated in Phoenix, which he knew to be a source city for narcotics, and the destination was the east coast. Defendant avoided eye contact and stared at his feet. Inspector Bradford confirmed that Defendant spoke English and asked for permission to search Defendant's carry-on bag. Defendant consented to a search of his bag. Inspector Bradford performed a thorough search lasting about 45 seconds to 1 minute, but found nothing unusual. Defendant remained seated and kept looking down at his feet on the floorboard. Inspector Bradford observed that Defendant became increasingly nervous to the point that his hands and legs were shaking. Also, Inspector Bradford considered the fact that Defendant continued to stare at his feet during the search to be unusual because passengers typically watch an officer while their personal belongings are being searched. Inspector Bradford knew from experience that narcotics are sometimes hidden in shoes.

Inspector Bradford asked if he could search Defendant's shoes. Defendant said yes, and then took off his left shoe and handed it to Inspector Bradford. It was a white, high-top athletic shoe, which seemed heavy and would not bend. Inspector Bradford moved the tongue of the shoe and immediately could see the insole had been altered. He pulled back the insole and uncovered a hidden package of narcotics. Inspector Carroll testified consistently with this version of events, although he admitted that he did not focus on the conversation between Inspector Bradford and Defendant until he heard Inspector Bradford ask to search Defendant's shoes, which was not a standard question. Although his report states that Inspector Bradford asked Defendant to remove

3

his shoe, Inspector Carroll recalled the question was something like, "Can I see your shoe?" or "Can I look in your shoe?"

Defendant's testimony deviated from the officers' version of events in two material respects. Defendant testified there was a Hispanic officer present to whom Inspector Bradford spoke and showed Defendant's ticket. Presumably, Defendant is referring to the third, federal agent who was described by the officers as being on hand to observe and assist with translation if needed, but generally remaining at the front of the bus. Also, Defendant testified that Inspector Bradford asked him twice to search his shoes because the first time Defendant acted like he did not hear and, more importantly, that Inspector Bradford told him to take off his shoes, as opposed to asking him. Defendant stated that he felt "a little" intimidated and felt he had to give his shoes to Inspector Bradford. Defendant testified he did not feel he could say no to Inspector Bradford because Inspector Bradford was a police officer and it was his job to search the bus, and because Defendant felt like Inspector Bradford knew there were drugs in his shoes.

Based on the Court's evaluation of the witnesses and their manner of testifying, the Court finds that Defendant was not instructed to remove his shoes but was asked by Inspector Bradford in a conversational tone and a noncoercive manner whether he could look at Defendant's shoes. The Court further finds, for reasons discussed below, that Defendant voluntarily consented to a search of his shoes and voluntarily surrendered the shoe in which heroin was found. Although the Court finds credible Defendant's testimony that he personally felt somewhat intimidated and he felt obliged to answer Inspector Bradford's questions and consent to the searches of his personal belongings, the Court finds that Defendant's subjective belief was a product of his guilty knowledge that he had drugs in his shoes. For reasons discussed below, Defendant's mistaken belief was not reasonable under the circumstances.

4

**Analysis**

"'When the government relies on a defendant's consent for the validity of a search, the government bears the burden of proving that defendant's consent was freely and voluntarily given, a determination we make by evaluating the totality of the circumstances.'" *United States v. Hill*, 199 F.3d 1143, 1150 (10th Cir. 1999) (quoting *United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996)). "In determining whether a police-citizen encounter is consensual, 'the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id*. at 1147 (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). The court of appeals has "identified various factors relevant to whether a reasonable person would not feel free to terminate the encounter with police:

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public."

*Id*. at 1147-48 (quoting *Sanchez*, 89 F.3d at 718). Concerning bus passengers, the Tenth Circuit has observed that while a bus may be a more confining environment than other locations, "the Supreme Court and this court have held repeatedly that the location of the encounter is but one factor in the totality of the circumstances." *Id* at 1148; *see Bostick*, 501 U.S. at 439 ("The cramped confines of a bus are one relevant factor that should be considered in evaluating whether a passenger's consent is voluntary."); *United States v. Little*, 18 F.3d 1499, 1504 (10th Cir. 1994) (en banc). The court of appeals has also "stated repeatedly 'that the particular personal traits or subjective state of mind of the defendant are irrelevant to the objective "reasonable person" test set out in *Bostick*, other than to the extent that they may have been known to the officer and influenced his conduct.'" *Hill*, 199

F.3d at 1149 (quoting *Little*, 18 F.3d at 1505). A failure to advise a bus passenger that he does not have to answer questions is a relevant factor, but it does not necessarily render the encounter nonconsensual because "[t]here is no per se rule requiring such an advisement." *See id*. (quoting *Little*, 18 F.3d at 1505); *see also United States v. Broomfield*, 201 F.3d 1270, 1275 (10th Cir. 2000).

In this case, the police officers gave the bus passengers no reason to believe they were required to answer questions. The officers did not display weapons, make intimidating movements, block the aisle or exit of the bus, or otherwise prevent passengers from leaving or moving about the bus or avoiding contact with police. The officers spoke to passengers one by one using a calm, conversational tone of voice. The officers did not say anything that would suggest to a reasonable person that he or she was prohibited from leaving or otherwise terminating the encounter. Although there is no evidence any passenger did so on this occasion, the officers testified that passengers occasionally decline to answer their questions or to participate in a search.

Specifically with regard to Defendant, Inspector Bradford did not say or do anything that would have caused a reasonable person to conclude that Defendant was required to cooperate. The conversation between Inspector Bradford and Defendant was calm and nonthreatening. Nothing about the encounter was objectively coercive, confrontational, or intimidating. Inspector Bradford did not speak in an authoritative manner or issue any commands. Although the conversation occurred in the cramped confines of a bus full of passengers waiting to depart from the station, there is no indication that anything prevented Defendant from leaving the bus and waiting outside while the officers were on board, if he wished to avoid Inspector Bradford. Alternatively, Defendant could have remained seated and chosen simply to ignore Inspector Bradford or decline to answer his questions. In short, nothing about the standard questioning that took place with regard to Defendant, or passengers in the bus generally, leads the Court to conclude that an unconstitutional seizure

6

occurred. More importantly, the Court finds from the totality of the circumstances presented that Defendant's consent to the search of his shoes was freely and voluntarily given.

Therefore, the Court finds no Fourth Amendment violation that led to the seizure of heroin from Defendant's shoes.

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress Evidence [Doc. No. 71] is DENIED.

IT IS SO ORDERED this 28th day of January, 2011.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE